**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALBERTHA FLETCHER and DONNA SMITH, Administrators of the Estate of Lashano Gilbert<br>    Plaintiffs,<br><br>    v.<br><br>CITY OF NEW LONDON, et al.<br>    Defendants. | No. 3:16-cv-241 (MPS) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

I.      **Introduction**

This case arises out of the death of Lashano Gilbert while in police custody on October 4, 2014, in New London, Connecticut. Plaintiffs Albertha Fletcher and Donna Smith, the administrators of Mr. Gilbert's estate, bring claims against ten police officers and the City of New London ("Police Defendants") for wrongful death, negligence, and violations of the Fourteenth Amendment, including deliberate indifference to medical needs and excessive force. They also bring claims of medical malpractice and wrongful death against a doctor, Deirdre Cronin-Vorih, who examined Mr. Gilbert in the Lawrence and Memorial Hospital emergency room after his arrest but before he was returned to police custody, as well as against Lawrence and Memorial Hospital.[1] Now before me are motions for summary judgment filed by Lawrence and Memorial Hospital ("the Hospital") (ECF No. 100) and the Police Defendants (ECF No. 103). The former moves for summary judgment on the ground that the plaintiffs have failed to provide evidence that Dr. Cronin-Vorih was an employee or agent of the Hospital at the time of Mr. Gilbert's death. The

---

[1] The plaintiffs previously brought claims against Lawrence and Memorial Corporation. I dismissed those claims in my ruling on the defendants' motion to dismiss. (*See* ECF No. 71.)

Police Defendants' motion asserts that plaintiffs have abandoned some claims, failed to raise a genuine dispute of material fact as to all claims, and failed to overcome the defense of qualified immunity as to the individual Police Defendants. For the reasons set forth below, the Hospital's motion for summary judgment is granted and the Police Defendants' motion is granted in part and denied in part.

## II. Background

### A. Factual Background

#### 1. Mr. Gilbert's Arrest

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated.[2] On October 3, 2014, "Lashano Gilbert jumped head first into the driver's window of a vehicle driven by Kathryn Arruda." (ECF No. 103-2, Police Defendants' Local Rule 56(a)1 Statement ("PD's L.R. 56(a)1 Stmt.") at ¶ 1; (ECF No. 115-1, the Plaintiffs' Local Rule 56(a)2 Statement ("Pl.'s PD L. R. 56(a)2 Stmt.") at ¶ 1.) Once in the vehicle, Mr. Gilbert spoke unintelligibly and pantomimed stabbing Arruda in the chest. (PD's L.R. 56(a)1 Stmt. at ¶ 2; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 2.)[3] Arruda called 9-1-1. (PD's L.R. 56(a)1 Stmt. at ¶ 3; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 3.)

---

[2] Although the Hospital and the Police Defendants filed separate motions for summary judgment, their Local Rule 56(a) Statements overlap significantly. I therefore draw from both defendants' Local Rule 56(a) Statements, as well as the plaintiff's Local Rule 56(a) Statement, in setting out the factual background. All of the facts listed within are undisputed by the Hospital, Police Defendants, and the plaintiffs unless otherwise noted.

[3] The plaintiffs deny this statement on the following grounds: "Plaintiff cannot oppose this fact. [P]laintiff has no personal knowledge of Katheryn Arudda [sic] getting strike [sic] in her chest by Gilbert. (Exhibit A ¶ 14, Exhibit P2)[.] [P]laintiff also has no knowledge as to whether [G]ilbert was pretending to stab Arruda[.]" (Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 2 (internal citation omitted).) This denial is improper and will be treated as an admission. The plaintiffs cannot deny the defendants' factual allegations on the basis of a lack of personal knowledge because they have had a full opportunity to conduct discovery in this case. *See Cooper v. City of*

When Officer Kurt Lavimoniere arrived at the scene, Mr. Gilbert ran at him while yelling incoherently. (PD's L.R. 56(a)1 Stmt. at ¶ 6; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 6.) Officer Lavimoniere discharged his Taser at Mr. Gilbert to halt his progress. (*Id.*) Once subdued, Mr. Gilbert "told officers on the scene that a ghost was inside him and was going to take his life if he did not bring [the ghost] to a cemetery in the Bahamas." (PD's L.R. 56(a)1 Stmt. at ¶ 7; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 7.) "While awaiting the arrival of [New London Fire Department] personnel, [Sergeant Lawrence M. Keating] attempted to deescalate the situation and asked Gilbert questions in an effort to get a better understanding of any mental illness or drug induced psychosis which he may have been suffering from." (PD's L.R. 56(a)1 Stmt. at ¶ 8; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 8.) Mr. Gilbert informed Sgt. Keating that "he took medications and was HIV positive." (PD's L.R. 56(a)1 Stmt. at ¶ 9; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 9.) Mr. Gilbert "resisted efforts to place him

---

*New Rochelle*, 925 F. Supp. 2d 588, 605 (S.D.N.Y. 2013) ("Plaintiffs respond to numerous of these factual allegations by denying knowledge or information sufficient to form a truth as to their belief. Thus, these allegations are deemed admitted." (internal quotation marks, citations, and emphases omitted).); *AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Servs. Inc.*, No. 06 CIV. 2142 (GEL), 2007 WL 4302514, at *4 (S.D.N.Y. Dec. 7, 2007) ("A nonmovant cannot raise a material issue of fact by denying statements which the moving party contends are undisputed for lack of knowledge and information in part because discovery allows the party opposing summary judgment to obtain the facts necessary to determine whether it must admit or deny them." (internal quotation marks omitted)). I will therefore exercise my discretion to deem this fact admitted. Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion . . . ."). I will also exercise my discretion to treat as admitted other facts denied by the plaintiffs in a similar manner in response to both defendants' Local Rule 56(a) Statements.

Finally, it is also worth noting that despite the plaintiffs' claims that they lack personal knowledge as to paragraph 2 of the Police Defendants' Local Rule 56(a)1 Statement, the defendants' factual allegation mirrors the plaintiffs' own complaint, which the plaintiffs inexplicably cite in their denial. (*See* Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 2 (citing ECF No. 56, Plaintiffs' Second Amended Complaint ("Complaint") at ¶ 20 ("While in the vehicle, Gilbert continued speaking unintelligibly, and made stabbing motions at Arruda [sic], although he had no knife, or tangible instrument in his hand.").)

in the ambulance and continued to resist while in the ambulance by moving his body, kicking his legs, attempting to bite and had to be restrained."  (PD's L.R. 56(a)1 Stmt. at ¶ 10; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 10.)

## 2.    Mr. Gilbert's Stay at the Hospital

Mr. Gilbert was taken to the Hospital's emergency department for a medical evaluation. (ECF No. 102, the Hospital's Local Rule 56(a)1 Statement ("Hospital's L.R. 56(a)1 Stmt.") at ¶ 5; (ECF No. 113, the Plaintiffs' Local Rule 56(a)2 Statement ("Pl.'s Hospital L.R. 56(a)2 Stmt.") at ¶ 5.)  While there, Mr. Gilbert was "evaluated and treated by an emergency medicine physician, Dr. Cronin-Vorih."  (Hospital's L.R. 56(a)1 Stmt. at ¶ 8; Pl.'s Hospital L.R. 56(a)2 Stmt. at ¶ 8.) Mr. Gilbert "was combative at [the hospital] and continued to attempt to bite Officer Griffin, EMS personnel, hospital security and medical personnel, and struggle against restraints."  (PD's L.R. 56(a)1 Stmt. at ¶ 11; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 11.)  "When the phlebotomist attempted to take blood, Gilbert was flailing his body and tried to bite saying he wanted to share his disease with them."  (PD's L.R. 56(a)1 Stmt. at ¶ 12; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 12.)  According to the police report documenting the incident, Mr. Gilbert "became stable, calm and cooperative" at some point later during his stay at the Hospital.  (ECF No. 103-3, Exhibit A ("Police Report") at 12.; *see also* ECF No. 56, Plaintiff's Second Amended Complaint, at ¶ 54 (noting that Mr. Gilbert experienced "states of calmness" during his stay at the Hospital).)    Mr. Gilbert was discharged from the hospital later that night.  ((PD's L.R. 56(a)1 Stmt. at ¶ 13; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 10; Hospital's L.R. 56(a)1 Stmt. at ¶ 11; Pl.'s Hospital L.R. 56(a)2 Stmt. at ¶ 11.)

## 3.    Mr. Gilbert's Release into Police Custody and Subsequent Death

Mr. Gilbert "was cooperative throughout the booking process, was unrestrained, calmly communicated with officers and exhibited no violent behavior."  (PD's L.R. 56(a)1 Stmt. at ¶ 14;

Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 14.)[4]  "When Gilbert first arrived at booking Officer Schafranski-Broadbent asked if he was injured and Gilbert showed her a small abrasion on his shoulder.  She placed a bandage on his shoulder and then upon his request allowed him to wash his hands behind the booking desk."  (PD's L.R. 56(a)1 Stmt. at ¶ 15; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 15.)  The parties contest the level of care provided by the police during this juncture.  The Police Defendants contend that Mr. Gilbert was "interviewed for suicide screening" and "was monitored at all times either by the presence of the officers in booking and/or video monitoring;" the plaintiffs contest both of these statements, but they point to no evidence to support their denial of "monitoring." (*See* PD's L.R. 56(a)1 Stmt. at ¶¶ 16-17; Pl.'s PD L.R. 56(a)2 Stmt. at ¶¶ 16-17.)  The Police Defendants' assertion that Mr. Gilbert was "monitored at all times" is thus deemed admitted.  D. Conn. L.R. 56(a)3.

"Approximately an hour and a half after arriving at the police station (11:30 p.m.) Gilbert, who was wearing a hospital gown, said he was cold.  Officer Lavimoniere explained [that] his sweatshirt had been cut off but he provided [Mr. Gilbert] with the jeans he had originally been wearing."  (PD's L.R. 56(a)1 Stmt. at ¶ 18; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 18.)  "At some point Gilbert was removed from the larger holding tank to do some paperwork.  He said he was thirsty so Officer Lavimoniere placed him in a cell with a working sink.  Gilbert asked to be put back into the holding tank so Lavimoniere allowed him to move back."  ((PD's L.R. 56(a)1 Stmt. at ¶ 19; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 19.)  "About [4.5] hours after arriving at booking (approximately

---

[4]  The plaintiffs deny this allegation on the following grounds: "Plaintiff cannot oppose this fact.  Plaintiff is unsure as to what defendants are attempting to articulate."  (Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 14.)  Since this denial is unsupported, I deem this fact admitted.  *See* D. Conn. L. R. 56(a)(3).

2:30 a.m.) Gilbert was observed on the video monitor twisting his pants and standing on a metal bench." (PD's L.R. 56(a)1 Stmt. at ¶ 20; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 20.)

"Officer Lavimoniere and Sgt. Johnson opened the cell door to have Gilbert get down from the bench and to take his pants." (PD's L.R. 56(a)1 Stmt. at ¶ 21; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 21.) "After speaking briefly with Gilbert, Sgt. Johnson and Officer Lavimoniere began to back out of the cell . . . when Gilbert suddenly lunged at Officer Lavimoniere, grabbing his Taser, ripping the battery/camera assembly [and] throwing it at the officer." (PD's L.R. 56(a)1 Stmt. at ¶ 122; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 22; ECF No. 104, Exhibit K, Video Exhibit ("Video Exhibit") at 2:39:01-2:39:30 A.M.) Mr. Gilbert then jumped over the booking counter, threw items at the officers, and placed one of the officers in a chokehold. (PD's L.R. 56(a)1 Stmt. at ¶ 23; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 23; Video Exhibit at 2:39:30-2:39:43 A.M.) "Officer Lavimoniere and Sgt. Johnson attempted to grab Gilbert's arms as he punched at them and tried to bite Sgt. Johnson. Officer Schafranski deployed her OC spray" to no apparent effect. (PD's L.R. 56(a)1 Stmt. at ¶ 24; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 24) "During the attempt to control Gilbert[,] he bit Officer Schafranski on the foot after he was taken to the ground." (PD's L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 25.) The Police Defendants assert that "Gilbert repeatedly kicked Officer Lavimoniere in the chest," but plaintiffs deny this, asserting that the video of the event does not show this. (*See* PD's L.R. 56(a)1 Stmt. at ¶ 26; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 26.) At some point during the fight, Officer Coe applied her Taser to Mr. Gilbert twice. (PD's L.R. 56(a)1 Stmt. at ¶ 27; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 27.) "At some point during the struggle, Fire Department EMS was called . . . ." (PD's L.R. 56(a)1 Stmt. at ¶ 28; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 28.)

The parties dispute the exact moment when Mr. Gilbert was subdued by the Police Defendants. The plaintiffs contend that Mr. Gilbert "was well under control" before the fire

department arrived on the scene, pointing again to the video. (Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 28.) The Police Defendants present a different account, averring that the fire department arrived before Mr. Gilbert was under control and that "[e]ven after being handcuffed, Gilbert continued to struggle while being placed on the stretcher." (P.D's L.R. 56(a)2 Stmt. at ¶ 28.) "Gilbert appeared to stop breathing while being transported in the ambulance and Officer Neff began performing C.P.R." (PD's L.R. 56(a)1 Stmt. at ¶ 30; Pl.'s L.R. 56(a)2 Stmt. at ¶ 30.) At some point en route to the hospital, an officer in the ambulance noticed that Mr. Gilbert lacked a pulse. (Police Report at 21.) Subsequent efforts to revive him were unsuccessful. (*Id.*) An autopsy conducted on Mr. Gilbert by Chief Medical examiner Dr. James Gill certified the cause of death as, "Physical altercation (restraint, electric shock, pepper spray) during acute psychosis complicating sickle cell hemaglobinopathy" and certified the manner of death as "Homicide (Physical altercation with Police)." (*Id.* at 24-25; ECF No. 115-8, Ex. 7 ("Autopsy") at 1.)

On October 20, 2014, the New London Probate Court appointed Albertha Fletcher and Donna Smith as co-administrators of Mr. Gilbert's estate. (ECF No. 61-1 at 2, 9-10.)

Additional facts will be discussed below in the analysis of the parties' arguments. I note in particular that I have reviewed videos showing Mr. Gilbert's arrival in the booking area; the booking process; Mr. Gilbert's placement in a holding cell; his activities in the cell for several hours; and the ultimate altercation with the officers. The videos are not accompanied by audio. The Police Defendants have set forth in their brief a chronology of the key events shown in the videos, which based on my review of the videos appears to be reasonably accurate (ECF No. 103-1 at 9-13) and is mostly uncontested by the plaintiffs, who rely little on the videos in their brief. I will discuss material aspects of the videos below.

### B.    Plaintiffs' Complaint

The plaintiffs' second amended complaint sets out the following claims against the Police Defendants, Dr. Cronin-Vorih, and the Hospital: (i) violation of Mr. Gilbert's right to due process under the Fourteenth Amendment and deliberate indifference to his "medical/mental health care needs" (Count One) (against the Police Defendants); (ii) violation of Mr. Gilbert's right against the use of excessive force under the Fourteenth Amendment (Count Two) (against the Police Defendants); (iii) medical malpractice (Count Three) (against the Hospital and Dr. Cronin-Vorih); (iv) wrongful death in violation of Conn. Gen. Stat. § 52-555 (Count Four) (against the Police Defendants); (v) negligence and "Misperformance of Ministerial Act" (Count Five) (against the Police Defendants); (vi) wrongful death in violation of Conn. Gen. Stat. § 52-555 (Count Six) (against the Hospital and Dr. Cronin-Vorih); and (vii) negligence resulting in imminent risk of harm to an identifiable person in violation of Conn. Gen. Stat. § 52-557n (Count Seven) (against the Police Defendants).  (*See generally* Complaint.)

## III.    **Legal Standard**

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted).  "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party.  *Cronin v. Aetna*

*Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). "Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists." *Jackson v. Nassau Cty. Bd. of Sup'rs*, 818 F. Supp. 509, 530 (E.D.N.Y. 1993). The non-moving party may not rely on the allegations of the complaint; he must point to admissible evidence warranting a trial. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (noting that a non-moving party may not rely "upon the mere allegations . . . [of his] pleading").

## IV. Discussion

Since the defendants' motions for summary judgment concern different claims, I address them separately.

### A. Police Defendants' Motion for Summary Judgment

The Police Defendants move for summary judgment on all of the plaintiffs' claims against them. (ECF No. 103 at 1.) I address each of these claims in turn.[5]

#### 1. Deliberate Indifference Claim

Because Lashano Gilbert was a pretrial detainee rather than a convicted prisoner at the time of these events, the plaintiffs' deliberate indifference claim is "governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). In the past, the Second Circuit applied the same standard in analyzing claims of deliberate indifference to medical needs brought under both the Eighth and Fourteenth Amendments. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) ("Claims for deliberate

_____

[5] I address the plaintiffs' claims against the City of New London separately in Section IV.A.4.

9

indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").  That standard provided that a prisoner must "satisfy two requirements" to establish such a claim: (1) he "must prove that the alleged deprivation of medical treatment is, in objective terms, sufficiently serious—that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain"; and (2) he must "prove that the charged official acted with a sufficiently culpable state of mind." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks omitted).

The Second Circuit adjusted the second prong of this standard in response to the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015).  *See Darnell*, 849 F.3d at 33.  In *Kingsley*, an excessive force case, the Supreme Court concluded that "an objective standard [of intent] is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment . . . ." *Id.* at 2476.  In response to *Kingsley*, the Second Circuit held in *Darnell* that "to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, [a] pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.  "In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Id.* Although *Darnell* concerned a claim of deliberate indifference to unconstitutional conditions of confinement, a footnote in the decision notes that "deliberate

indifference means the same thing for each type of claim under the Fourteenth Amendment." *Id.* at 33, n. 9. "District courts in this Circuit have therefore applied *Darnell*'s objective '*mens rea*' prong to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment." *Walker v. Wright*, No. 3:17-CV-425 (JCH), 2018 WL 2225009, at *5 (D. Conn. May 15, 2018) (listing cases). Thus, to establish their deliberate indifference claim, the plaintiffs must show: (1) "that the alleged deprivation of medical treatment [was], in objective terms, sufficiently serious—that is, [that Mr. Gilbert's] medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson*, 412 F.3d at 403; and (2) that the Police Defendants "acted intentionally to impose [this] alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [Mr. Gilbert] even though the [Police Defendants] knew, or should have known, that the condition posed an excessive risk to health or safety," *Darnell*, 849 F.3d at 35.

There are two distinct periods of time at issue in the plaintiffs' deliberate indifference claim: (1) the discharge of Mr. Gilbert from the Hospital into police custody and his subsequent booking at the police station; and (2) the approximately four hours in which Mr. Gilbert remained in the holding cell before he attacked the Police Defendants. I examine each separately.

### a. Hospital Discharge and Booking

The plaintiffs' claim fails with respect to the first time period. As noted above, Mr. Gilbert was discharged by Hospital staff. ((PD's L.R. 56(a)1 Stmt. at ¶ 13; Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 10; Hospital's L.R. 56(a)1 Stmt. at ¶ 11; Pl.'s Hospital L.R. 56(a)2 Stmt. at ¶ 11.) The plaintiffs contend that the Police Defendants should have involuntarily committed him to the Hospital's care despite his discharge. (*See* ECF No. 115 at 3, 6.) In support of this contention, the plaintiffs point to the report of their expert, Robert Prevot, who concluded that the Police Defendants' failure to

place Mr. Gilbert on an involuntary psychiatric hold at the Hospital constituted deliberate indifference to his medical needs. (*See* ECF No. 103-27, Ex. BB, Report of Plaintiff's Police Practices Expert, Robert Prevot ("Prevot Report") at 8 ("Opinion #2: The collective knowledge of the Police Officers present during Mr. Gilbert's arrest was more than sufficient to warrant an involuntary psychiatric hold on Mr. Gilbert. The New London Police Department and Dr. Cronin, the attending physician at Lawrence & Memorial Hospital, were deliberately indifferent to the emergency medical needs of Mr. Gilbert.").) The plaintiffs assert, in part on the basis of this report, that the officers should have had Mr. Gilbert involuntarily committed after his discharge under Conn. Gen. Stat. § 17a-503(a), which allows "[a]ny police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, [to] take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section." (*See* ECF No. 115 at 7.)

The plaintiffs' contention fails for three reasons. First, the officers who brought Mr. Gilbert to the Hospital for emergency examination after his arrest had effectively already complied with this statute. They did not exhibit deliberate indifference in declining to deliver Mr. Gilbert up for emergency examination a second time immediately after he was cleared for discharge. Second, such an action would have required the officers to override the opinion of Dr. Cronin-Vorih that Mr. Gilbert was fit to be discharged. The officers were not required to do so. Indeed, one of the key factors in determining whether a medical condition is sufficiently serious for purposes of a deliberate indifference claim is "[t]he existence of an injury that a reasonable doctor . . . would find important and worthy of comment or treatment . . . ." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted). Here, the only doctor involved in this

case—Dr. Cronin-Vorih—informed the Police Defendants that Mr. Gilbert was fit to be discharged into police custody. The Fourteenth Amendment did not require the officers attending Mr. Gilbert to second guess Dr. Cronin-Vorih's opinion.

Third, a review of the video evidence undermines the plaintiffs' argument. When Mr. Gilbert arrived at the police station, he was calm. The video of the booking area shows that he arrived with Officer Tidd at about 10:04 P.M. and was cooperative and responsive throughout the thirty-five minutes or so that it took to book him and place him in the holding cell. (*See* Video Exhibit at 10:04-10:39 P.M.; PD's L.R. 56(a)1 Stmt. at ¶ 14 (noting Mr. Gilbert "was cooperative throughout the booking process, was unrestrained, calmly communicated with officers and exhibited no violent behavior"); *see also* Pl.'s PD L.R. 56(a)2 Stmt. at ¶ 14 (admitting this contention).) More specifically, during these thirty-five minutes, Mr. Gilbert was uncuffed and his leg irons were removed, and most of the time he sat on a bench across a counter behind which three female officers were standing. One of those officers was occupied with paperwork for part of the time and often was not looking at Mr. Gilbert; a second left the room after a while; and a third can be seen talking to Mr. Gilbert. At times, Mr. Gilbert stands and mills about in front of the counter, but his movements are deliberate and non-threatening, and none of the officers shows any signs of being alarmed or on guard.

During this time, Mr. Gilbert also cooperates while being fingerprinted; signs some paperwork; washes his hands in a sink; lifts his shirt so that a female officer can apply ointment and a Band-Aid to his shoulder; and steps off camera, according to the Police Defendants, to be photographed. It is true that, according to the police statements, some of the subjects of Mr. Gilbert's conversations during this time—that his aunt was touching his head and that there was a ghost giving him instructions—raised questions about his mental capacity. (*See* ECF No. 103-13,

Ex. L, Statement of Officer Melisa Schafranski-Broadbent ("Schafranski-Broadbent Stmt.") at 1 (noting that Mr. Gilbert "was pulling his hair in an upward motion and repeatedly saying his aunt was touching him" during the booking process).) It is also true that, on the video, he can be seen occasionally pulling his shirt over his head—which, based on the police statements, may have been to protect his head from the imagined graspings of his aunt—and fidgeting his legs. But nothing shown in the video during the thirty-five-minute booking sequence suggests that he is violent or a danger to himself or others. Neither he nor any officer makes any sudden movements; at no time do the officers call for assistance or draw any weapons; and at no time does Mr. Gilbert raise his arms at the officers or do anything else suggestive of a threat of violence. The sequence ends when a single officer escorts him to the holding cell. (*See generally* Video Exhibit).

Based on this evidence, even including the evidence of Mr. Gilbert's nonsensical statements about his aunt and ghosts, no reasonable juror could find that Officer Tidd or Officer Christina was deliberately indifferent to Mr. Gilbert's medical needs. As noted above, the entire booking sequence took place shortly after a doctor had examined him and released him to the officers' custody. Further, the fact that he was, at times, talking nonsense was not by itself a basis for finding that he was suffering from an objectively serious medical condition that required immediate medical attention. He had just received such attention, and the topics of his conversation in the booking area were no more troubling than they had been at the hospital or during this arrest, only in the booking area, he was much calmer. There is simply no evidence that Officer Tidd or Officer Christina "recklessly failed to act with reasonable care" to "mitigate [a] risk" that they knew or should have known of, *Darnell*, 849 F.3d at 35; indeed, no reasonable juror viewing the video of the booking could conclude that the officers should have been aware of such

a risk, even armed with the knowledge that Mr. Gilbert was discussing phantom events with the officers.

Courts have declined to find deliberate indifference in cases involving inmates suffering from more serious levels of psychosis or delirium and for longer periods of time. *See Smith v. Cty. of Lenawee*, 505 F. App'x 526, 534 (6th Cir. 2012) (concluding Sergeant who observed pretrial detainee suffering several days of worsening delirium and exhibiting "paranoid and irrational actions" and moved her to a padded cell before she died in custody, had qualified immunity given medication prescription provided by jail's medical doctor and doctor's advice that prisoner did not require more urgent care); *Burnette v. Taylor*, 533 F.3d 1325, 1331-32 (11th Cir. 2008) (holding that officers and jailers responsible for detainee who died of drug overdose in custody were entitled to qualified immunity even though one of them was aware of detainee's possession of pills, his slurred speech, and that his eyes were rolling back in his head); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (granting motion to dismiss deliberate indifference claim against prison official who ignored plaintiffs' injuries for over a week in light of doctors' advice that prisoner did not require further assistance); *contrast Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir. 1990) (holding that *doctor's* indifference to inmate's three days of delirium during heroin withdrawal could constitute deliberate indifference), *overruled on other grounds Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). As such, the plaintiffs' deliberate indifference claim fails with respect to Officers Christina and Tidd, who went off duty shortly after Mr. Gilbert was processed and placed in the holding cell at 10:39 P.M. (*See* ECF No. 103-12, Exhibit J, Statement of Kristy Christina ("Christina Stmt.")

at 2 ("I had no further contact with Gilbert as my shift ended at 2300 hrs."); ECF No. 103-10, Exhibit H, Statement of Patricia Tidd ("Tidd Stmt.") at 4 ("At 2300 hours my shift ended.").)[6]

### b. In Holding Cell

I likewise conclude that the plaintiffs have failed to raise a genuine dispute of material fact regarding Mr. Gilbert's tenure in the holding cell. First, three of the officers—Officers Coe, Neff, and Bunkley—were not present during Mr. Gilbert's internment in the holding cell and thus could not have been deliberately indifferent to his medical needs. Each of these officers arrived at the station only after Mr. Gilbert's altercation with the other officers had begun. (*See* ECF No. 103-17, Ex. R, Statement of Wayne Neff ("Neff Stmt.") at 1 (noting that he drove back to the station around 3:00 A.M. after being told that the other officers required backup); (ECF No. 103-16, Ex. Q, Statement of Officer Doreen G. Coe ("Coe Stmt.") at 1 (same); (ECF No. 103-21, Ex. V, Statement of Officer Chris Bunkley ("Bunkley Stmt.") at 1 (same).)

---

[6] The opinion of the plaintiffs' expert, Prevot, that the "[c]ollective knowledge of the Police Officers present during Mr. Gilbert's arrest was more than sufficient to warrant an involuntary psychiatric hold on Mr. Gilbert" and that the officers were "deliberately indifferent to the medical needs of Dr. Gilbert" does not affect this conclusion, because it is a legal opinion and thus one that cannot create a genuine dispute of material fact. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissible."). The plaintiffs do not dispute the material facts or suggest that the video footage is inaccurate; Prevot's opinion is simply a conclusion—purportedly based on those facts—that the Police Defendants had a legal duty under the fourteenth Amendment to invoke their authority under a Connecticut statute to commit Mr. Gilbert to a hospital for emergency treatment against his will. (Prevot Report at 7-8.) In expressing his opinion, Prevot does not cite any national or other standards governing police conduct, any policies or procedures, any practices of other police departments, or even his own experience; he merely recites the undisputed facts concerning Mr. Gilbert's behavior and then slaps on his conclusion of "deliberate indifference." Even if it were not a legal conclusion, it would be inadmissible under *Daubert* as the "*ipse dixit* of an expert." *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Second, the plaintiffs have failed to point to evidence establishing a genuine issue of material fact regarding whether the other officers were deliberately indifferent. The record demonstrates that Mr. Gilbert's behavior did not deviate significantly from the time he was placed in the holding cell until the time he attacked the officers, except that he began to behave in a more concerning manner in the few minutes before the officers entered the cell, i.e., shortly before the altercation began. After was placed in the cell, his behavior until the altercation was relatively calm or, at the very least, not so obviously disturbed as to warn the officers that he was a danger to himself or others or needed immediate medical attention. My review of the portion of the video showing the approximately four hours he spent in the holding tank before the officers entered and he attacked them is generally consistent with the description in the Police Defendants' brief (ECF No. 103-1 at 9-13), which the plaintiffs do not contest. During this time, Mr. Gilbert is fairly active—he uses the toilet; he walks around; he peers out the window towards the booking area; he sits on the bench; he lies down on the bench for sustained periods; and he exercises—pushups, crunches, and the like. He can be observed speaking at times, but, as noted, there is no audio. At one point, he apparently notices the camera and begins speaking toward the camera and waving at it. Towards the end of his time in the cell, he stands on the bench and, then, beginning at about 2:08 A.M., jogs in place on a low wall separating the toilet from the rest of the cell. He also appears to be cold at one point and, according to the police reports, informs the officers of this. An officer opens the door and gives him his pants. At times he wears his pants on his arms apparently to warm them up—and then at other times (*see, e.g.*, Video Exhibit at 2:22:30 A.M.) he twists or winds them, as if to form a rope.

To be sure, there is also evidence in the record that Mr. Gilbert was acting strangely during this time. Officer Lavimoniere noted in his statement that, at one point, Mr. Gilbert "began

chanting in an unknown language" while "rock[ing] back and forth on one of the benches in" the holding cell, and the rocking motion is visible on the video at one point. (ECF No. 115-3, Ex. 2, Statement of Officer Kurt Lavimoniere ("Lavimoniere Stmt.") at 4.) But the standard in the involuntary commitment statute on which the plaintiffs rely requires that an officer have "reasonable cause to believe that a person has psychiatric disabilities *and is dangerous to himself . . . or others . . .* and in need of *immediate* care and treatment . . . ." Conn. Gen. Stat. § 17a-503(a) (emphasis added). There is no evidence that Mr. Gilbert's behavior met this standard before he began maneuvering his pants in such a way as to concern the other officers that he planned to commit suicide at approximately 2:36:00 A.M. (*See* Video Exhibit at 2:36:00-2:39:00 A.M.) As noted above, the officers entered the cell to retrieve his pants at that point, and the altercation ensued.

### c. Qualified Immunity

In any event, the Police Defendants here have qualified immunity, a point the plaintiffs do not even address in their brief. (*See* ECF no. 103-1 at 32.) "The doctrine of '[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). To establish a qualified immunity defense against a claim of deliberate indifference, "the defendants must show that it was objectively reasonable . . . for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (internal quotation marks and citations omitted). "In other words, so long as a rational jury would find that reasonable officers could disagree about the constitutionality or legality of their actions, defendants will be entitled to qualified immunity and, therefore, summary judgment

on [the plaintiffs'] deliberate indifference claim." *Colliton v. Gonzalez*, No. 07 CIV. 02125 RJH, 2011 WL 1118621, at *5 (S.D.N.Y. Mar. 23, 2011).

Here, at a minimum, reasonable police officers working the night shift at an urban police station could disagree about whether to seek immediate commitment or medical attention due to Mr. Gilbert's occasional pacing his cell, muttering to himself, and chanting—interrupted by periods of rest and exercise. The plaintiffs have cited no "clearly established law" addressing a situation even remotely approaching this one, and, as noted, the case law I could find addressing delirious or psychotic inmates does not suggest that the officers in this case were deliberately indifferent. Further, under the circumstances—an inmate who had just been cleared for release from the Hospital by a doctor and was generally cooperative, but who also was, at times, speaking nonsense and fidgeting for a few hours in a police holding cell—it can at least be said that reasonable police officers could disagree that it was necessary to invoke the involuntary commitment statute or otherwise to seek immediate remedial care. Mr. Gilbert's occasional pacing in his cell, muttering to himself, and chanting did not render the officers' decision not to institutionalize him unreasonable.

I therefore conclude that the Police Defendants are entitled to summary judgment with respect to the plaintiffs' deliberate indifference to medical needs claim.

### 2. Excessive Force Claim

The plaintiffs' excessive force claim is bifurcated into two parts—(1) a claim averring that certain officers used excessive force against Mr. Gilbert, resulting in his death; and (2) a failure to intervene claim alleging that certain officers stood by and watched as this excessive force unfolded. I address these two components of the plaintiffs' claim in turn.

### a. Officers' Use of Force

I begin by analyzing the contours of the plaintiffs' excessive force claim and, in particular, which officers the plaintiffs contend used excessive force against Mr. Gilbert. As an initial matter, the plaintiffs concede that, "given Mr. Gilbert's combative behavior," some "force was necessary to subdue him . . . ." (ECF No. 115 at 12.) This concession is wise. The video demonstrates that the altercation between Mr. Gilbert and the officers began with a ferocious assault by Mr. Gilbert that posed a genuine threat to the safety of the three officers present. Mr. Gilbert bursts into the booking room at approximately 2:39 A.M., hurdles a counter, and throws various objects— including an oxygen tank—at the three officers attempting to contain him. (*See* Video Exhibit at 2:39:00-2:30:00 A.M.) At one point during this initial onslaught, he puts a female officer in a chokehold before releasing her after a few seconds and darting towards the door. (*See id.* at 2:39:38 A.M.) Despite being cornered by the three officers shortly thereafter, Mr. Gilbert manages to continue forcibly resisting for at least another two minutes before finally being pinned to the ground by the officers, including a fourth officer who had entered the booking area during the fight. (*See id.* at 2:39:38-2:41:45 A.M.) Even after this point, Mr. Gilbert continued to offer some resistance for at least a short while thereafter.[7]

The plaintiffs focus their excessive force claim, however, on a point in time after "five minutes and sixteen seconds of physical altercation." (ECF No. 115 at 12.) At this point, they contend, "several officers . . . continued to apply a significant and brutal amount of physical force to Gilbert" after he was completely subdued. (*Id.* at 12.)[8] In particular, the plaintiffs allege that

---

[7] It is worth noting that the plaintiffs' own expert concluded that the officers' use of force "to control . . . Mr. Gilbert was objectively reasonable . . . ." (Prevot Report at 12.)

[8] The plaintiffs also aver that Officer Johnson applied excessive force during this time period but do not present any specific evidence—or even a specific allegation—that Johnson used excessive force against Mr. Gilbert. (*See* ECF No. 115 at 12-13.) As such, I omit him from this discussion.

Officers Wayne-Neff, Cable, Bunkley and White leaned their full weight onto Mr. Gilbert's body after he had been subdued with Taser darts, handcuffs, and leg shackles and was lying on the floor. (*Id.* at 12-13.) They also argue that Officer Wayne-Neff gave instructions to cover Mr. Gilbert's mouth and that Officer White then wrapped a towel around Mr. Gilbert's head. (*Id.* at 13.) Given the plaintiffs' focus on Officers Bunkley, Wayne-Neff, Cable, and White, I conclude that the plaintiffs have abandoned their excessive force claim against the other officers—i.e., Officers Tidd, Schafranski-Broadbent, Christina, Lavimoniere, Johnson and Coe.[9] I now turn to the plaintiffs' excessive force claim against Officers Wayne-Neff, White, Bunkley and Cable.

An "[a]nalysis of a claim for use of excessive force begins with identification of the specific constitutional right allegedly infringed by the challenged application of force." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks and alterations omitted). Here, that constitutional right is provided by the due process clause of the Fourteenth Amendment. *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) ("While the Eighth Amendment's protection does not apply until after conviction and sentence, the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." (internal quotation marks and citations omitted)). In *Kingsley*, the Supreme Court held that to set out an excessive force claim, a pre-trial detainee like Mr. Gilbert "must show only that the force purposely or knowingly used against him was objectively unreasonable."[10] *Kingsley*, 135 S. Ct. at 2473. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989.) A court "must make

---

[9] The plaintiff has presented evidence that these officers failed to intervene on Mr. Gilbert's behalf, as discussed further below in Section IV.2.b.

[10] Neither of the parties cited the *Kingsley* standard in framing their arguments on this point.

this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* The *Kingsley* Court laid out the following relevant considerations in determining the "reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

The Police Defendants contend that the officers' use of force was objectively reasonable. (*See* ECF No. 103-1 at 17.) They argue in particular that the officers' placement of their weight on Mr. Gilbert was reasonable given his ongoing resistance "until being placed on the stretcher" and that the towel was necessary to prevent Mr. Gilbert from biting or spitting at the officers. (*Id.* at 20-21.) Yet certain factual issues preclude a finding in the defendants' favor. First, the initial ferocity of Mr. Gilbert's assault on the police officers in the booking room does not necessarily justify the use of force that allegedly resulted in Mr. Gilbert's death. The video demonstrates that after being subdued—in part with Taser darts—Mr. Gilbert was held in a prone position with various officers leaning their weight on him for several minutes before the arrival of the emergency medical personnel. (*See* Video Exhibit at 2:45:00-2:51:00 A.M.). By 2:45 A.M., Mr. Gilbert is held in place on the floor with his legs pointing toward the holding cell door; despite the Police Defendants' claim that Mr. Gilbert is resisting after this point, he does not appear to move his legs again before being placed on the stretcher. (*See id.*) Indeed, a reasonable juror viewing the video could find that there is no sign of any significant movement by Mr. Gilbert during this time period. (*See id.*) Further, Officer Coe noted in her statement that the officers were able to shackle Mr. Gilbert before emergency personnel arrived. (*See* Coe Stmt. at 2 (noting that the officers were

able to "complete the cuffing process" and "shackle the prisoner's leg" before the arrival of emergency personnel).) Thus, there is a genuine issue of material fact regarding whether it was necessary for the officers to continue leaning their weight on Mr. Gilbert.

Second, the evidence in the record raises a genuine dispute of material fact concerning whether the officers ignored Mr. Gilbert's protestations that he could not breathe due to his positioning as they carried out these actions. Officer Coe wrote in her statement that Mr. Gilbert screamed that he could not breathe as the officers held him down. (*See* Coe Stmt. at 2.) Officer Coe's statement notes that "[o]fficers in the booking area reassured the prisoner that if he was screaming he was breathing" and that a mask was subsequently placed over his "mouth area because he was still actively attempting to bite at Officers." (*Id.* at 3.) Drawing all inferences in the plaintiffs' favor, a reasonable juror could conclude that the officers' actions resulted in Mr. Gilbert's suffocation and that the officers ignored his protestations as this occurred.

The Police Defendants claim that the towel—and subsequently the mask—were placed over Mr. Gilbert's mouth due to his ongoing attempts to bite the officers. (ECF No. 103-1 at 20-21.) I have viewed the video, however, and a reasonable juror could conclude that Mr. Gilbert's head was restrained by 2:46 A.M. At roughly 2:47 A.M., an officer approaches Mr. Gilbert's head and appears to apply pressure to Mr. Gilbert's face. (*See* Video Exhibit at 2:47:00-2:48:00 A.M.) Although it is not clear from the video exactly what is occurring, a reasonable juror could determine that the officer is pressing down on Mr. Gilbert's head at this juncture and even potentially kneeling on his head at one point. At roughly 2:49:25 A.M., the officer walks away and Mr. Gilbert's face becomes visible—it does not appear to be moving. (*See* Video Exhibit at 2:49:25 A.M.) Despite this, another officer places a towel over Mr. Gilbert's face at approximately 2:50:35 A.M. (*See* Video Exhibit at 2:50:35 A.M.) In the interim, the officers are still maintaining

their weight on Mr. Gilbert. This video footage creates a genuine issue of material fact concerning whether the officers in question used excessive force against Mr. Gilbert. Finally, as noted above, an autopsy conducted on Mr. Gilbert by Chief Medical examiner Dr. James Gill certified the cause of death as, "Physical altercation (restraint, electric shock, pepper spray) during acute psychosis complicating sickle cell hemaglobinopathy" and certified the manner of death as "Homicide (Physical altercation with Police)." (Autopsy at 1.) This piece of evidence raises a genuine issue of material fact—at the very least—concerning whether the officers' actions directly resulted in Mr. Gilbert's death.

Thus, I conclude that the plaintiffs' excessive force claim survives with respect to Officers Wayne-Neff, Bunkley, Cable, and White

### b. Failure to Intervene

The plaintiffs claim against the remaining individual officers—Tidd, Schafranski-Broadbent, Christina, Lavimoniere, Johnson and Coe—rests upon their alleged failure to intervene on Mr. Gilbert's behalf. (*See* ECF No. 115 at 14.) "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [ 42 U.S.C. §1983]." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). An officer is "personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Gonzales v. Waterbury Police Dept.*, 199 F. Supp. 3d 616, 621 (D. Conn. 2016) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003)). With regard to the latter category, an officer is liable for failing to intercede when he or she "observes or has reason to know . . . that excessive force is being used" and has "a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552,

557 (2d Cir. 1994). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.*

The record in this case gives rise to a genuine dispute of material fact regarding whether most but not all of the officers named above had a realistic opportunity to intervene on Mr. Gilbert's behalf. The plaintiffs' claim fails as to Officers Tidd and Christina, however, who, as noted above, were not present at the altercation. The remainder of the officers appear to have been present during the majority of the altercation. All of these officers averred in their statements that they were involved in the subduing of Mr. Gilbert before the arrival of emergency medical personnel. (*See* Coe Stmt. at 2 (noting that she helped restrain Mr. Gilbert before the ambulance arrived); Schafranski-Broadbent Stmt. at 3-4 (same); ECF No. 103-22, Exhibit W, Statement of Officer Christopher White ("White Stmt.") at 1-2 (same); ECF No. 115-5, Ex. 4, Statement of Sergeant Scott C. Johnson ("Johnson Stmt." at 3-5 (same)); ECF No. 115-3, Ex. 2, Statement of Officer Kurt Lavimoniere ("Lavimoniere Stmt.") at 7 (same).) None of the officers' statements clearly state that they left early on in the altercation[11] or otherwise contend that they were unable to assist Mr. Gilbert as he screamed that he could not breathe. Further, the video of the incident appears to demonstrate that each of the officers was present in the minutes before Mr. Gilbert was removed by medical personnel—i.e., when the plaintiffs claim excessive force was used against him. (*See* Video Exhibit at 2:46:00-2:51:00.) As such, there is a genuine dispute of material fact concerning whether each of these officers could have intervened to prevent the alleged use of excessive force against Mr. Gilbert.

---

[11] Johnson and Lavimoniere note they left the room at one point to tend to various injuries but returned before Mr. Gilbert was removed from the room. (*See* Johnson Stmt. at 4-5; Lavimoniere at 7.)

###### c.      Qualified Immunity

The Police Defendants contend that all of the officers are entitled to judgment as a matter of law on the plaintiffs' excessive force claim on the basis of qualified immunity. (*See* ECF No. 103-1 at 26.) This contention suffers from several flaws. As an initial matter, despite the fact that they claim that all of the officers named as defendants are entitled to qualified immunity, they only make a particularized argument as to Officers Schafranski, Coe, and White. (*See* ECF No. 103-1 at 27-31.) Nonetheless, I will address the application of the qualified immunity doctrine to all of the officers involved, save, of course, Officers Tidd and Christina. First, the officers directly involved in the subduing of Mr. Gilbert are not entitled to qualified immunity as a matter of law. The evidence, when viewed in the light most favorable to the plaintiff, suggests that the officers subdued Mr. Gilbert and were able to shackle both his arms and legs. (*See* Coe Stmt. at 2 (noting that the officers were able to "complete the cuffing process" and "shackle the prisoner's leg" before the arrival of emergency personnel).) After Mr. Gilbert was subdued in this manner, he began screaming that he could not breathe. (*See id.* at 2.) Despite these protestations, either a towel or a soft mask were placed over Mr. Gilbert's mouth. (*See* Coe Stmt. at 3 (claiming a "soft mask was placed on the prisoner['] mouth area"); Neff Stmt. at 2 (referring to the mask as a "towel").) During this entire time, several officers were kneeling on his body and one officer was applying pressure to his face, including by kneeling on his head at one point. A reasonable juror viewing the evidence in the light most favorable to the plaintiffs could find that these applications of force were gratuitous, and that this was apparent to all the officers in the booking area. As a result of these actions, Mr. Gilbert died. (*See* Police Report at 24-25 (listing Mr. Gilbert's cause of death as "Homicide (Physical altercation with Police)").) A reasonable jury could find that the officers'

actions in this regard—which contributed to the death of a subdued and shackled inmate—constituted a violation of his clearly established rights.

The same rationale applies to the officers who were present at the scene but did not directly participate in the subduing of Mr. Gilbert. If a jury accepted the account listed above, then it could reasonably conclude that these officers declined to intervene on Mr. Gilbert's behalf despite his screams that he could not breathe while officers were kneeling on or applying their weight on his prone body. A reasonable jury could therefore find that these officers were liable for failing to intervene to protect Mr. Gilbert's clearly established right against the use of excessive force. Thus, the question of qualified immunity folds into the overall factual dispute between the parties, thereby negating the possibility of summary judgment. *See Rogoz*, 796 F.3d at 250 (defendants not entitled to summary judgment on ground of qualified immunity on basis of disputed record).

### 3. Claims Against the City of New London

The Police Defendants contend that the plaintiffs' claims against the City of New London in Count One and Count Two fail because the plaintiffs have not presented any facts or evidence supporting the claim. (ECF No. 103-1 at 35.) The plaintiffs have failed to respond to the Police Defendants' challenge to their claims against the City of New London. Thus, I conclude that the plaintiffs have abandoned this claim. *See, e.g., National Communications Ass'n, Inc. v. American Tel. & Tel. Co.*, 92 Civ. 1735, 1998 WL 118174 at *28 (S.D.N.Y. March 16, 1998) (granting defendant summary judgment on claim where plaintiff did not address claim in response to defendant's summary judgment motion); *Anti–Monopoly, Inc., v. Hasbro, Inc.*, 958 F. Supp. 895, 907 & n. 11 (S.D.N.Y.) ("the failure to provide argument on a point at issue constitutes abandonment of the issue"); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendants' motion for summary

judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone.").

I therefore grant the Police Defendants summary judgment motion with respect to all of the plaintiffs' claims against the City of New London.[12]

### 4. Plaintiffs' State Law Claims

The Police Defendants move for summary judgment with respect to all of the plaintiffs' state law claims against them.  The plaintiffs did not respond to the Police Defendants' argument or otherwise defend their state law claims in their objection.  While the plaintiffs' brief includes a subheading "New London Police Defendants Should've Put an Involuntary Psychological Disability hold on Gilbert," (ECF No. 115 at 6), it is clear, in light of the record as a whole, that this portion of their brief is meant to support plaintiffs' deliberate indifference claims under the fourteenth Amendment, not their negligence claims.  First, the only express reference to a specific legal claim in this portion of the brief is the following: "Instead of Officer Lavimoniere and Officer Tidd placing an involuntary psychological disability hold on Gilbert, . . . said officers showed a deliberate indifference to Gilbert's mental health care needs and transported the untreated Gilbert to the New London Police Department." (ECF No. 115 at 9.)  Second, while a specific allegation about a "psychological disability hold" is not mentioned in the complaint, to the extent it is embraced in other, broader allegations, those allegations are made to support the deliberate indifference claim, not the negligence claims.  For example, the complaint alleges that Officer Tidd, who was at the hospital with Mr. Gilbert and transported him to the police station, "did not bring Gilbert back to the hospital, or take any action toward obtaining medical assistance for

---

[12]  Given this disposition, I decline to address the Police Defendants' argument concerning the plaintiffs' "failure to supervise" claim against the City of New London. (*See* ECF No. 103-1 at 33.)

[him]."  (ECF No. 56 at ¶ 57.)  Tidd is also expressly mentioned in the deliberate indifference claim, which asserts that she "witnessed and had personal knowledge of Gilberts [sic] obvious need for medical/mental health care . . . immediately after being released to her custody."  (ECF No. 56, Count One at ¶ 5.)  But Tidd is not mentioned in the wrongful death and negligence claims, which appear to be focused on later points in time.

Third, plaintiffs' "Psychological Disability Hold" argument in their summary judgment brief relies primarily on the report of their expert, Robert Prevot, who, as noted above, opines that "[t]he collective knowledge" of the Police Defendants "was more than sufficient to warrant an involuntary psychiatric hold on Mr. Gilbert" and that they, along with Dr. Cronin-Vorih, "*were deliberately indifferent to the emergency medical needs of Mr. Gilbert*."  (Prevot Report at 8 (emphasis added).)  That opinion, moreover, focuses on the arrest of Mr. Gilbert, his time at the hospital, and his transport from the hospital to the police station.  (*see id.*), including the actions of Officer Tidd, not on the later events at the police station that appear to be the focus of the negligence and wrongful death claims.  Fourth and finally, neither the "involuntary psychological disability hold" section of plaintiffs' opposition brief nor any other portion offers any response to the Police Defendants' arguments as to the negligence claims regarding ministerial acts, police policies, discretionary act immunity, and the identifiable victim/imminent harm exception.  I therefore conclude that plaintiffs have chosen to abandon the negligence and other state law claims and grant the defendants judgment as a matter of law on those claims.  *See National Communications Ass'n, Inc.*, 1998 WL 118174 at *28 (S.D.N.Y. March 16, 1998);  *Anti–Monopoly, Inc.*, 958 F. Supp. at 895, 907 & n. 11 (S.D.N.Y.); *Ostroski*, 443 F. Supp. 2d at 340.

*          *          *

I therefore grant the Police Defendants' motion for summary judgment with respect to all of the plaintiffs' claims against them besides the excessive force claim (including the failure to intervene claim), which will proceed to trial save as to Officers Tidd and Christina.

## B. The Hospital's Motion for Summary Judgment

The Hospital moves for summary judgment on the ground that the plaintiffs have failed to present evidence that Dr. Cronin-Vorih was acting as an agent for the Hospital when she provided medical care and treatment to Mr. Gilbert. (*See* ECF No. 101 at 4.) The plaintiffs claim that there is a genuine dispute of material fact concerning whether Dr. Cronin-Vorih acted as an actual or apparent agent of the Hospital. I address each of these theories of agency in turn.

### 1. Actual Agency

Under Connecticut law, "[a]gency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act . . . ." *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 120, 132 (1983) (internal quotation marks omitted). "Thus the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Id.* at 133. Some of the relevant factors courts should look to in determining whether an agency relationship exists include: "whether the principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools, and the place of work; and the method of paying the agent." *Id.* (internal quotation marks omitted). "An essential ingredient of agency is that the agent is doing

something at the behest and for the benefit of the principal." *Leary v. Johnson*, 159 Conn. 101, 105 (1970).

The plaintiffs set out a laundry list of evidence that they contend demonstrates that Dr. Cronin-Vorih was an agent of the Hospital. These pieces of evidence include: (1) an Internet website profile noting that Dr. Cronin-Vorih "[j]oined L+M" in 2011 (ECF No. 112-1, Ex. 1 ("Website") at 2); (2) three newspaper articles noting that Dr. Cronin Vorih worked at the Hospital (*see* ECF No. 112-2, Ex. 2 at 2-3 (noting that Dr. Cronin-Vorih "began working at L+M [3.5] years ago"); ECF No. 112-3, Ex. 3 at 3 (noting that Dr. Cronin-Vorih "works in the emergency department at Lawrence & Memorial Hospital in New London"); ECF No. 112-4, Ex. 4 at 2 (noting that Dr. Cronin-Vorih works as an "emergency department physician at Lawrence + Memorial Hospital"); (3) a picture in one of the newspaper articles showing Dr. Cronin-Vorih in  the emergency room at the Hospital (*see* ECF No. 112-5, Ex. 5 at 2); (4) a still image of Dr. Cronin-Vorih wearing what appears to be a badge with the Hospital's insignia on it (ECF No. 112-6, Ex. 6 at 2); (5) an affidavit from Dr. Cronin-Vorih stating that she has "worked in the emergency department at Lawrence and Memorial since May 21, 2011" but also that she is "employed by Emergency Medicine Physicians of New London County, LLC" (ECF No. 112-7, Ex. 7, Affidavit of Deirdre Cronin-Vorih ("Cronin-Vorih Aff.") at 2); (6) interrogatory responses by Dr. Cronin-Vorih noting that she held medical staff privileges at the Hospital in order to provide patient care within the emergency department (*see* ECF No. 112-8, Ex. 8 at 6-9); (7) a record from the Hospital noting that Dr. Cronin-Vorih treated Mr. Gilbert at the Hospital (ECF No. 112-9, Ex. 9 at 2); (8) an interrogatory response from the Hospital confirming that Dr. Cronin-Vorih held staff privileges at the Hospital (ECF No. 112-10, Ex. 10 at 8); (9) a record confirming that Dr. Cronin-Vorih maintains a business address at the same address as the Hospital (ECF No. 112-8, Ex. 8 at 6

(interrogatory response by Dr. Cronin listing her business address as 365 Montauk Avenue, New London, CT); ECF No. 112-11, Ex. 11 at 2 (commercial listing of the Hospital's address as 365 Montauk Avenue, New London, CT)); (10) two still images of Dr. Cronin-Vorih from television interviews with captions listing her name above the name of the Hospital (ECF No. 112-12, Ex. 12 at 2; ECF No. 112-13, Ex. 13 at 2); and (11) the two videos of Dr. Cronin-Vorih from which those still images were taken (ECF No. 112-14, Ex. 14; ECF No. 112-15, Ex. 15).

While these pieces of evidence establish that Dr. Cronin-Vorih has worked at the Hospital and held privileges there since 2011, they do not suggest that she acted as an agent of the hospital on the night she treated Mr. Gilbert. Dr. Cronin-Vorih stated in her affidavit and interrogatory responses that she is employed by Emergency Medicine Physicians of New London County, LLC, which holds a contract with the Hospital to provide emergency medicine specialty services. (*See* ECF No. 112-7, Ex. 7 at 2; Cronin-Vorih Aff. at 8 ("I was and am an employee of Emergency Medicine Physicians of New London County, LLC ("EMP"). EMP maintains a contract with L+M to provide emergency medicine services at L+M's Emergency Department.").) The Hospital made the same representation in its interrogatory response. (*See* ECF No. 112-10, Ex. 10 at 8 ("At the time care was rendered to Mr. Gilbert, Dr. Deirdre Cronin-Vorih was associated with Emergency Medicine Physicians of New London County, LLC ("EMP"). EMP maintained a contract with L+M to provide emergency physician specialty services at L+M's Emergency Department.").)

Further, the fact that Dr. Cronin-Vorih held staffing privileges at the Hospital does not make her an agent of the hospital.[13] *See Cefaratti v. Aranow*, 154 Conn. App. 1, 30 (2014) ("In

---

[13] It is worth noting that one of the cases the defendants cite in favor of this proposition, *Gagliano v. Advanced Specialty Care, P.C.*, 167 Conn. App. 826 (2016), was recently reversed in part by the Connecticut Supreme Court. *See Gagliano v. Advanced Specialty Care, P.C.*, 329 Conn. 745 (2018). *Gagliano* concerned a negligence claim against a hospital predicated on the actions of a resident. *See id.* at 748-49. The *Gagliano* court concluded that the plaintiffs had

the context of a medical malpractice action, our Superior Court has consistently held that the fact that a physician holds staff privileges at a hospital is not sufficient to support a finding that an agency relationship was created."), *rev'd in part on other grounds*, 321 Conn. 637 (2016); *Griffin v. St. Vincent's Med. Ctr.*, No. CV065005220, 2011 WL 522024, at *2 (Conn. Super. Ct. Jan. 11, 2011) ("Performing administrative tasks or having staff privileges does not establish agency."); *Spaulding v. Rovner*, No. X08CV044001232S, 2009 WL 1175555, at *4 (Conn. Super. Ct. Apr. 3, 2009) ("No Connecticut court case has been cited, nor has the court found any case, holding that a physician having staff privileges at a hospital is thereby an actual agent of the hospital."); *Walker v. Temple Surgical Ctr.*, No. X10UWYCV065005306S, 2008 WL 4926876, at *4 (Conn. Super. Ct. Nov. 3, 2008) ("Where the only connection between a physician and a hospital is that he has staff privileges at the hospital, the majority of the courts that have considered the question of whether the physician is an agent of the hospital have found that this factor does not weigh in favor of a finding that the doctor is an agent." (internal quotation marks and alterations omitted)).

Thus, the plaintiffs are left with the circumstantial pieces of evidence noted above. None of the evidence establishes a genuine dispute of material fact regarding whether Dr. Cronin-Vorih was an agent of the Hospital. As an initial matter, the website profile noting that Dr. Cronin-Vorih joined the Hospital in 2011 merely establishes that she has worked there since 2011. It does not establish that she was *employed* by the Hospital since that time. The newspaper articles and television clips of Dr. Cronin-Vorih that note that she works at the Hospital are hearsay and thus

---

demonstrated that the resident was an actual agent of the hospital; it based this holding, however, mainly on a hospital house staff manual which laid out the resident's obligations and responsibilities, including various statements suggesting that the Hospital would supervise and had the right to control the resident's medical work. *See id.* at 759-62. There is no indication of similar evidence in this case. I therefore conclude that the reasoning of *Gagliano* does not apply to the parties' present dispute.

inadmissible, but in any event they do not suggest an agency relationship.  None of those sources

suggest that she was employed by the hospital or that the hospital had the right to control her work.

They simply refer to the place she worked.  Further, the fact that Dr. Cronin-Vorih wore a badge

that appeared to contain the Hospital's insignia also does not move the needle for the plaintiffs in

the absence of other corroborating evidence that such a badge signals an agency relationship.

Finally, the hospital records the plaintiffs cite undermine their claim.  The plaintiffs' ninth exhibit

contains a form titled "**AUTHORIZATIONS FOR BASIC TREATMENT**," which contains the

following passage:

> **My Physicians are Independent Contractors Responsible for My Care**: I
> understand that my physician, including radiologists and anesthesiologists, are not
> employees or agents of the Hospital.  While the Hospital periodically reviews the
> credentials of all of its physicians, my physician(s) – not the Hospital – are
> responsible for the care that they provide to me while I am in the Hospital.  I further
> understand that if I have any questions for my physician(s), including questions
> about the nature or risks and benefits of, or the alternatives to any intended
> operation or procedure, or questions about the physician's charges or bills, my
> physician is solely responsible for answering such questions.

(ECF No. 112-9, Ex. 9 at 28.)[14]  This passage further suggests that Dr. Cronin-Vorih was not an

agent of the Hospital.  Thus, the plaintiffs' evidence that Dr. Cronin-Vorih acted as an actual agent

of the Hospital at the time of Mr. Gilbert's treatment there does not rise above speculation.  Such

evidence is not enough to stave off summary judgment.  *See Cifarelli v. Vill. of Babylon*, 93 F.3d

47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a

party resisting summary judgment.").

## 2. Apparent Agency

---

[14]  The form in question was not signed by Mr. Gilbert because he was unresponsive
when he arrived at the hospital.  (*See* ECF No. 112-9, Ex. 9 at 28-29.)

The plaintiffs also contend that they have raised a genuine dispute about whether Dr. Cronin-Vorih acted as an apparent agent of the Hospital. (ECF No. 112 at 7.) I disagree.[15] The Connecticut Supreme Court recently adopted the theory of apparent agency in tort cases, setting out the following standard.

> First, the plaintiff may establish apparent agency by proving that: (1) the principal held itself out as providing certain services; (2) the plaintiff selected the principal on the basis of its representations; and (3) the plaintiff relied on the principal to select the specific person who performed the services that resulted in the harm complained of by the plaintiff. Second, the plaintiff may establish apparent agency in a tort action by proving the traditional elements of apparent agency, as set forth in our cases involving contract claims, plus detrimental reliance. Specifically, the plaintiff may prevail by establishing that: (1) the principal held the apparent agent or employee out to the public as possessing the authority to engage in the conduct at issue, or knowingly permitted the apparent agent or employee to act as having such authority; (2) the plaintiff knew of these acts by the principal and actually and reasonably believed that the agent or employee or apparent agent or employee possessed the necessary authority; and (3) the plaintiff detrimentally relied on the principal's acts, i.e., the plaintiff would not have dealt with the tortfeasor if the plaintiff had known that the tortfeasor was not the principal's agent or employee. We emphasize that this standard is narrow, and we anticipate that it will be only in the rare tort action that the plaintiff will be able to establish the elements of apparent agency by proving detrimental reliance.

*Cefaratti v. Aranow*, 321 Conn. 593, 624-25 (2016). The plaintiffs' claims of apparent agency fail under both of these theories for similar reasons—the plaintiffs have not presented any evidence that Mr. Gilbert selected the Hospital on the basis of any representations or that he knew of or relied on the Hospital's representations or other conduct suggesting that Dr. Cronin-Vorih was its agent. Rather, the undisputed evidence in the record shows that Mr. Gilbert was taken to the Hospital against his will and was in a state of psychosis when he arrived. (*See* Hospital's L.R. 56(a)1 Stmt. at ¶ 6 (noting that the plaintiffs' complaint alleges Mr. Gilbert "presented to the

---

[15] The Hospital contends that the plaintiffs failed to raise this allegation in their complaint. (*See* ECF No. 116 at 6.) I decline to address this argument in light of my conclusion that the plaintiffs' claim fails on the merits in any event.

emergency department in a state of delirium" (internal quotation marks omitted)); Pl.'s Hospital L.R. 56(a)2 Stmt. at ¶ 6 (admitting this fact); ECF No. 115 at 2 ("Throughout his time with the police, during transport, and in the hospital, Mr. Gilbert was in an obvious state of delirium.")

The plaintiffs argue that Mr. Gilbert's psychotic state at the time of his arrival at the Hospital does not preclude them from arguing an apparent agency theory. (ECF No. 112 at 112.) In support of this contention, they cite the Connecticut Superior Court's decision in *Ntumbanzondo v. Bang Chau*, No. CV116017893S, 2014 WL 341722, at *7 (Conn. Super. Ct. Jan. 7, 2014). *Ntumbanzondo* concerned, in relevant part, whether a plaintiff could bring an apparent agency claim against a doctor based on the death of a patient brought to a hospital in a state of unconsciousness.[16] *See id.* at *7. The *Ntumbanzondo* court concluded that the plaintiff could bring such a claim because the plaintiffs—whom the court noted "were responsible for the decedent"— "reasonably relied on the fact that complete emergency room care would be provided by the defendant." *Id. Ntumbanzondo* was decided before the Connecticut Supreme Court's decision in *Cefaratti*, but another judge of the Superior Court reached a similar decision in *Lavoie v. Manoharan*, No. CV146027376S, 2017 WL 10059006 (Conn. Super. Ct. May 24, 2017), which concerned whether a plaintiff could bring an apparent agency claim based upon the death of a patient at a hospital who had been taken by ambulance to the hospital in a state of unconsciousness. *Id.* at *1-2. The *Lavoie* court upheld the plaintiff's claim, opining that "it should not matter whether the decedent was unconscious or conscious because a jury could find that a responsible

---

[16] The court noted that there was a factual dispute regarding whether the patient was actually unconscious at the time of his arrival. *See Ntumbanzondo*, 2014 WL 341722, at *7 ("[A]t the very least, an issue of fact remains as to whether the [patient] was actually unconscious the entire time while under the care of [the defendant].").

third party for the decedent reasonably relied on the fact that complete emergency room care would be provided by the defendant." *Id.* at *7.

Both *Lavoie* and *Ntumbanzondo* rely on an Illinois case, *Monti v. Silver Cross Hosp.*, 262 Ill. App. 3d 503, 507 (1994). *See Ntumbanzondo*, 2014 WL 341722, at *7 (citing *Monti* extensively); *Lavoie*, 2017 WL 10058006, at *7 (same). *Monti*, like *Lavoie* and *Ntumbanzondo*, concluded that an apparent agency claim could rest upon a scenario where an unconscious patient was brought to a hospital. *See Monti*, 262 Ill. App. 3d at 508. The *Monti* court rested its holding on the basis that "[t]hose responsible for [the plaintiff] sought care from the hospital, not from a personal physician, and thus, a jury could find that they relied upon the fact that complete emergency room care, including diagnostic testing and support services, would be provided through the hospital staff." *Id.*

I reject the plaintiffs' argument that the Hospital could be liable despite Mr. Gilbert's state of delirium at the time of his arrival there for several reasons. First, I do not read *Cefaratti* as authorizing such a broad doctrine of apparent agency. The *Cefaratti* court listed as an element of one apparent agency theory that "the plaintiff select[] the principal on the basis of its representations . . ." and as elements of the second theory that the plaintiff know of the acts by which the principal held out the apparent agent as possessing the requisite authority and that the plaintiff rely on those acts. *Cefaratti*, 321 Conn. at 624. An unconscious patient cannot "select" the hospital to which he is taken, or know of acts by the hospital, let alone rely on them. The holding of *Cefaratti* thus does not support the plaintiff's apparent agency theory. Further, given the Connecticut Supreme Court's emphasis on conscious choice and deliberate conduct in defining both theories of apparent agency, *Cefaratti*, 321 Conn. at 624-25 ("(1) the principal held itself out . . ., (2) the plaintiff selected the principal . . ., and (3) the plaintiff relied on the principal to select

the person . . . .”; “(1) the principal held the apparent agent . . . out to the public . . . ; (2) the plaintiff knew of these acts by the principal . . .; and (3) the plaintiff detrimentally relied . . . .”), and its emphasis on the narrow scope of the second theory (“We emphasize that this standard is narrow . . . .”), I predict that the Connecticut Supreme Court, if confronted with the facts in this record, would not extend the doctrine of apparent agency to a case like this. *See Plummer v. Lederle Labs., Div. of Am. Cyanamid Co.*, 819 F.2d 349, 355 (2d Cir. 1987) (“A federal court sitting in diversity must follow the law directed by the Supreme Court of the state whose law is found to be applicable, and if there is no direct decision by the highest court of that state, the federal court should determine what it believes that state’s highest court would find if the issue were before it.”).

The plaintiffs’ stated position would have the effect of turning every physician in a hospital’s critical care unit into apparent agents of the hospital, regardless of the steps taken by the hospital to disclaim an agency relationship with the doctors who have privileges there. Here, for example, the Hospital used a form stating in bold-face type that each patient’s physician is an independent contractor ((ECF No. 112-9, Ex. 9 at 28), making clear to all patients that it was not holding its “apparent agent or employee out to the public as possessing the authority to engage in the conduct at issue, or knowingly permitt[ing] the apparent agent or employee to act as having such authority.” *Cefaratti*, 321 Conn. at 624. The Sixth Circuit’s decision in *Roberts v. Galen of Virginia, Inc.*, 111 F.3d 405, 413 (6th Cir. 1997), *rev'd on other grounds*, 525 U.S. 249, 119 S. Ct. 685, (1999), is instructive on this point. *Roberts* concerned, in relevant part, a claim of apparent agency against a hospital. *Id.* at 407, 413. The hospital’s standard intake paperwork provided to outpatients included a form noting that the hospital’s physicians were “independent practitioners and . . . not employees or agents of the hospital.” *Id.* The patient was unable to sign this disclaimer,

however, due to her injuries. *Id.* at 413. The *Roberts* court nonetheless concluded that this form foreclosed the plaintiff's apparent agency claim, because the hospital had not held its employees out as its apparent agents. *Id.* at 413. This reasoning applies here as well, especially because it is consistent with the notion of consent—express or implied—inherent in Connecticut's law of agency. Whether an agency relationship is actual or apparent, the principal, through its words, actions, or at least deliberate inaction, must express some form of consent that the agent will act for it. In actual agency, that consent is expressed by a "manifestation by the principal that the agent will act for him." *Beckenstein*, 191 Conn. at 133. In apparent agency, it is expressed either by making representations to the plaintiff that it will provide certain services, with the plaintiff relying on it to select the person who performs the services, or by holding out the apparent agent to the public as possessing certain authority. Plaintiffs have cited no Connecticut appellate authority—and I am aware of none—in which a principal has had an agent thrust on it against its will and despite its efforts to disclaim any agency relationship.[17]

For these reasons, I conclude that the plaintiffs have failed to point to any evidence giving rise to a genuine dispute of material fact concerning whether Dr. Cronin-Vorih acted as an apparent agent of the Hospital. I therefore dismiss the plaintiffs' claims against the Hospital.

## V.    Conclusion

For the foregoing reasons, the Hospital's motion for summary judgment (ECF No. 100) is hereby GRANTED. The Police Defendants' motion for summary judgment (ECF No. 103) is hereby GRANTED IN PART AND DENIED IN PART. It is granted with respect to all of the

---

[17] Because the Hospital made an effort to inform its patients that doctors were not its agents, I need not decide in this case whether a plaintiff who arrived unconscious or in delirium at a hospital that had held out its doctors as apparent agents would, in spite of his or her inability consciously to rely on the hospital's conduct, be able to establish apparent agency.

plaintiffs' claims against the Police Defendants besides the excessive force claim, which will proceed to trial save as to Officers Tidd and Christina and the City of New London.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, USDJ

Dated:          Hartford, Connecticut
                September 25, 2018