# EXHIBIT B

```
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------X
DONNA SMITH AND ALBERTHA FLETCHER,
ADMINISTRATORS OF THE ESTATE
OF LASHANO GILBERT,

                                PLAINTIFFS,

    -against-                    CASE NO:
                                 3:16-CV-00241-MPS

LAWRENCE + MEMORIAL HOSPITAL, INC.
CITY OF NEW LONDON, DR. DEIRDRE
CRONIN-VORIH; OFFICER PATRICIA TIDD,
OFFICER MELISSA SCHAFRANSKI-
BROADBENT, SEARGANT SCOTT JOHNSON,
SEARGANT KRISTY CHRISTINA, OFFICER
KURT LAVIMONIERE, OFFICER DOREEN
COE, OFFICER RICHARD CABLE, OFFICER
WAYNE-NEFF, OFFICER CHRISTOPHER
BUNKLEY, AND OFFICER CHRISTOPHER
WHITE,

                                DEFENDANT.
-------------------------------------------------------X

                         DATE:  July 11, 2018

                         TIME:  10:19 A.M.
```

DEPOSITION of the non-party witness, CHARLES CATANESE, M.D., taken by the respective parties, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the offices of Diamond Reporting & Legal Video, 12 Scotchtown Avenue, Goshen, New York 10924, before Sandra Noel Bartels, a Notary Public of the State of New York.

```
 1
 2   A P P E A R A N C E S:
 3
 4   LAW OFFICES OF JAMAAL T. JOHNSON, LLC
       Attorneys for the Plaintiffs
 5     DONNA SMITH AND ALBERTHA FLETCHER,
       ADMINISTRATORS OF THE ESTATE OF
 6     LASHANO GILBERT
       1229 Albany Avenue, Suite 301
 7     Hartford, Connecticut 06112
       BY:   JAMAAL T. JOHNSON, ESQ.
 8     jamaal@jtjohnsonlaw.com
 9
     DANAHER LAGNESE, P.C.
10     Attorneys for the Defendant
       LAWRENCE + MEMORIAL HOSPITAL, INC.
11     21 Oak Street, Suite 700
       Hartford, Connecticut 06106
12     BY:   THOMAS N. LYONS, ESQ.
       tlyons@danaherlagnese.com
13
14   HALLORAN & SAGE, LLP
       Attorneys for the Defendant
15     DEIRDRE CRONIN-VORIH, M.D.
       One Century Tower
16     265 Church Street, Suite 802
       New Haven, Connecticut 06510
17     BY:   PETER SACHNER, ESQ.
       sachner@halloransage.com
18
19   HASSET & GEORGE, P.C.
       Attorneys for the Defendants
20     CITY OF NEW LONDON, OFFICER PATRICIA TIDD, OFFICER
       MELISSA SCHARFRANSKI-BROADBENT, SEARGANT SCOTT
21     HOHNSON, SEARGANT KRISTY CHURSTINA, OFFICER KURT
       LAVIMONIERE, OFFICER DOREEN COE, OFFICER RICHARD
22     CABLE, OFFICER WAYNE-NEFF, OFFICER CHRISTOPHER
       BUNKLEY and OFFICER CHRISTOPHER WHITE
23     945 Hopmeadow Street
       Simsbury, Connecticut 06070
24     BY:   DAVID C. YALE, ESQ.
       dyale@hgesq.com
25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5    IT IS HEREBY STIPULATED AND AGREED by and between

6    the counsel for the respective parties herein that

7    the sealing, filing and certification of the within

8    deposition be waived; that the original of the

9    deposition may be signed and sworn to by the witness

10   before anyone authorized to administer an oath, with

11   the same effect as if signed before a Judge of the

12   Court; that an unsigned copy of the deposition may

13   be used with the same force and effect as if signed

14   by the witness, 30 days after service of the

15   original & 1 copy of same upon counsel for the

16   witness.

17

18    IT IS FURTHER STIPULATED AND AGREED that all

19   objections except as to form, are reserved to the

20   time of trial.

21

22              *     *     *     *

23

24

25

Page 4

```
 1                    C. CATANESE, M.D.
 2   C H A R L E S     C A T A N E S E,    M.D. , called
 3   as a witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was examined
 5   and testified as follows:
 6   EXAMINATION BY
 7   MR. SACHNER:
 8        Q.    Good morning, doctor.
 9        A.    Good morning.
10        Q.    We were introduced before we went on
11   the record but again for the record my name is Peter
12   Sachner and I represent one of the defendants in
13   this matter brought on behalf of the Estate of
14   Lashano Gilbert.  I represent Dr. Cronin, the filed
15   emergency medicine physician.
16              You understand you have been designated
17   as an expert witness on behalf of the plaintiff?
18        A.    Yes.
19        Q.    That is in your stat as a pathologist;
20   correct?
21        A.    Yes.
22        Q.    And the opinions you intend to testify
23   today are based on your review of this case as a
24   board certified pathologist?
25        A.    Yes.
```

Page 9

1                    C. CATANESE, M.D.
2    trait.
3         Q.    What relevance to your opinion did the
4    cardiovascular chapter have on your opinions here?
5         A.    Just a review of factors that cause
6    myocardial irritability leading to arrhythmias and
7    death.
8         Q.    And what were some of those factors
9    that were identified?
10        A.    Having an enlarged heart.  Having
11   hypoxia.
12        Q.    How is hypoxia caused generally,
13   doctor?
14        A.    There's many mechanisms that can lead
15   to hypoxia, but it's generally a decreased amount of
16   oxygenation in the blood.
17        Q.    Can asphyxiation result in hypoxia?
18        A.    Yes.
19        Q.    Is it your opinion that's what caused
20   hypoxia in this case?
21        A.    From my knowledge of the case I can say
22   it's possible.  I don't have a lot of specific
23   knowledge about exactly what the restraining was
24   like.
25        Q.    Okay.  So, for example, you understand

Page 10

1              C. CATANESE, M.D.
2  in this your stead, you don't have the specific
3  details of the events that happened at the police
4  station; correct?
5       A.    That's correct.  I have some knowledge
6  of it by what's in the autopsy report.  I know there
7  was a restraining but I don't know specifically how
8  it was done.  I know there were bruises, some of
9  which were to the person's back, and I think that I
10 was told there was a cover put over the decedent's
11 head which might cause some decreased ability to
12 breathe.  And also the tasering that occurred too
13 can cause difficulties with breathing.
14      Q.    We'll get into various sources of
15 information and you mentioned you were told certain
16 things and we'll get to here.  But I'm interested in
17 what you actually reviewed by way of documents are
18 in front of you in the file that you brought;
19 correct?
20      A.    Yes, that's correct.
21      Q.    And if I'm right, the documents, the
22 official records in this case are limited to the
23 autopsy report, documents issued from the medical
24 examiner including the autopsy report and the
25 autopsy photographs; am I correct?

Page 16

1                C. CATANESE, M.D.
2  Lawrence + Memorial?
3       A.    Only a brief discussion about
4  Mr. Gilbert being discharged to the police or to the
5  jail.
6       Q.    Any other specifics or is that
7  generally it?
8       A.    I believe that's it.
9       Q.    That you can recall, right?
10      A.    Yes.
11      Q.    Any oral information that Mr. Johnson
12 conveyed to you that you are relying on to form the
13 basis of your expert opinions in this case?
14      A.    No.
15      Q.    Now, you have various e-mail
16 correspondence that you were good enough to provide
17 me as we requested in our Exhibit A.  I am going to
18 mark this and we can make copies and return it to
19 you.
20           (Exhibit 2, series of e-mail
21       correspondence, marked for identification.)
22      Q.    For identification I've marked as
23 Exhibit 2 a series of e-mail correspondence between
24 you and Mr. Johnson; is that correct?  Just to
25 identify?

Page 39

1                    C. CATANESE, M.D.
2    the stated cause of death, which we won't repeat,
3    but the wording that Dr. Gill used in this medical
4    examiner report; correct?
5         A.     Yes.
6         Q.     And below that he states the manner of
7    death which we discussed before, homicide (physical
8    altercation with police); correct?
9         A.     Yes.
10        Q.     You concur with Dr. Gill that the
11   manner of death was as he states?
12        A.     Yes.
13        Q.     Just to be complete, doctor, not to
14   beat a dead horse, do you have any other conclusion
15   that you intend to offer within a reasonable degree
16   of medical certainty as to the manner of death other
17   than what is contained in the report by Dr. Gill?
18        A.     No, I don't.
19        Q.     Let me get back to this in a bit.  I'm
20   going to review your CV for a second.  I have marked
21   that ahead as Exhibit 4.  Do you have your CV in
22   front of you, doctor, you can refer to a copy?
23        A.     Yes, I do.
24        Q.     Just for efficiency, I'll identify that
25   Exhibit 4 contains the nine pages of your CV.  Is

Page 93

1                    C. CATANESE, M.D.
2        Q.     Doctor, break it down.  This presence
3   of sickle cells, red blood cells, does not diagnose
4   or determine that red cell sickling was a causative
5   factor in the death of an individual possessing only
6   sickle cell trait.  Can we agree on that?
7        A.     Yes, by itself it certainly doesn't
8   necessarily indicate it.
9        Q.     Your opinion is that in tandem with the
10  other circumstances surrounding here, it does
11  indicate it; is that your opinion?
12       A.     Yes.
13       Q.     Are you able to parse out the
14  respective contributing factors here?
15       A.     Yes.
16       Q.     Why don't you do that for us.
17       A.     So you have a physical altercation
18  which is exerting oneself significantly which will
19  create a hypoxic or decreased oxygen, heavy
20  breathing increased the acidosis in the blood.  All
21  of these things are associated with causing a
22  sickling effect.  The restraint is part of the
23  struggle and the restriction of movement.  The
24  electric shock giving -- even though very rarely can
25  cause the heart to go into arrythmia, while the

Page 94

1                C. CATANESE, M.D.
2    shock is being performed it can tighten the muscles
3    and prevent breathing which would further cause
4    hypoxia.  And then with the pepper spray, it's very
5    difficult to breathe sometimes when you get pepper
6    sprayed in the face.  Not only the burning to the
7    eyes which is painful and causing the heart rate to
8    increase, it can cause a vasospasm or the airway to
9    close up and decreased breathing.  And to add this
10   on during an acute psychosis is very dangerous
11   because you have a set up for an excited delirium
12   type picture where you have excessive catecholamine
13   input throughout the body and the combination of the
14   hypoxia, the pain, the physical straining and the
15   acute psychosis is a setup for a fatal arrythmia in
16   the heart.  The sickle cell hemoglobinopathy in
17   times of great stress would most likely manifest and
18   that's supported by the congestion of the blood
19   vessels with the sickle cell as well.
20        Q.    Can congestion of blood vessels be
21   appreciated on autopsy apart from the presence of
22   sickle cell trait?
23        A.    If certain areas, yes.
24        Q.    For example, if the patient has an
25   underlying respiratory condition, that can cause

Page 117

1                    C. CATANESE, M.D.
2    is the most comprehensive.
3          Q.     What that consists of, you are not
4    sure; right?
5          A.     I'm not 100 percent sure.
6          Q.     Just finishing your report, can you
7    rule out that the encounter Mr. Gilbert had with the
8    police including the physical altercation with the
9    various attendant events, can you rule out that
10   encounter, absent psychosis or sickle cell
11   hemoglobinopathy, resulted in a fatal cardiac
12   arrythmia and subsequent death; can you rule it out?
13         A.     I cannot rule it out 100 percent but I
14   think it would be extremely more unlikely.
15         Q.     Why do you say that?
16         A.     Because it just doesn't happen in the
17   -- unless there was an underlying cardiac anomaly or
18   reason for him to have a fatal arrythmia, it would
19   be very unusual whereas it's well documented with
20   acute psychosis.  And then throwing the sickle cell
21   hemoglobinopathy on top of it would only make it
22   worse.
23         Q.     Well, we've gone through the literature
24   and what is well documented or not; correct?
25         A.     Yes.

Page 138

1                   C. CATANESE, M.D.
2     the other.  Am I right?
3          A.     I'm not sure I understand the mechanism
4     for that case.  They each had an opinion of what
5     happened and I was fairly certain of what happened
6     but they didn't come up with enough scenarios and I
7     couldn't speak freely.
8          Q.     You didn't have enough information
9     available to you; correct?
10         A.     Yeah, that would have helped me a lot
11    to have more information, yes.
12         Q.     So in this case you told Mr. Lyons that
13    you don't know for instance if Mr. Gilbert had a
14    towel placed over his face; correct?  You didn't
15    know that, right?
16         A.     Yeah, I didn't now exactly what was
17    obstructing the airway or how tight the fabric was
18    or how tight the towel was placed --
19         Q.     Or how long it was placed on him;
20    correct?
21         A.     And that would help a lot to know all
22    that and --
23         Q.     Those facts would be significant; would
24    they not?
25         A.     Yes.